es for his failure to attend, and the court, on deciding that the plaintiff failed to prove many essential facts, and among others that the witness was duly subpœnaed, expressed the view that on an adjournment of the trial from Saturday until Monday the witness was either entitled to per diem fees for both Sunday and Monday, or to be excused or discharged from attendance under the first subpœna, and to be duly subpœnaed anew and paid mileage and the per diem fees for Monday.

I am of opinion, therefore, that when a witness is duly subpœnaed to attend court it is his duty, unless relieved by special application to the court on the ground that there has been an abuse of process in holding him in attendance at the court, to attend from day to day on due payment of the per diem allowance prescribed by the statute, and that it is not necessary, in the case of the usual recess of the court over Sunday or a legal holiday, to subpœna him over and pay another mileage. Of course, if after a witness is duly in attendance the case in which he is subpœnaed should be postponed for some time, or the court should be adjourned for a longer period than the ordinary recess, the court would not require the witness to remain in attendance on payment of a per diem fee, when it was known that the case could not be moved for trial, or that the court was not to be in session; and in such case, doubtless, the attorneys for the respective parties would be warranted, without special application to the court, in serving new subpœnas without applying to the court for a ruling on the question, and that is the effect of the decisions in Moulton v. Townsend, supra, and Miller v. Huntington, supra.

It follows that the motion for a retaxation of the costs should be granted, and that the second item for mileage for said five witnesses should be disallowed, and there should be substituted therefor an item of $5 for the per diem fees of the witnesses, and the cost should be retaxed at $240.63; but since the question is novel, and not free from doubt, no costs of the motion are allowed.

Ordered accordingly.

---

### In re ANDERSON (two cases).

(Supreme Court, Appellate Division, Second Department. October 3, 1913.)

1. JUDGMENT (§ 717*)—CONCLUSIVENESS.

　　Where a trustee purchased a lease of real property with accumulations, and it having been thereafter decreed that the provision for the accumulations was void, and that three children of the testator took the accumulations in equal shares by the intestacy of their ancestor in respect thereto, pursuant to such decree the trustee turned over the accumulations, including the lease, one-third to each child, the judgment and compliance therewith was conclusive of all questions as to the propriety of the purchase of the lease with the accumulations, and as to the title to it vesting in the persons specified.

　　[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1248; Dec. Dig. § 717.*]

2. INSANE PERSONS (§ 42*)—COMMITTEE—ACCOUNTING—SURCHARGE.

　　A trustee under a will, who was also one of the beneficiaries and committee of the estate of an incompetent brother, as trustee purchased an

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

outstanding lease of real property belonging to the estate with accumulations under the will. It was thereafter determined that the accumulations were void, and that three children, the trustee individually, his sister, and the incompetent took the same in equal shares as intestate property; whereupon the trustee turned over the accumulations, including the lease, one-third to each. When the lease expired, one-third of the fee of the property vested in certain minors and one-third in the trustee, while the other third was limited to the incompetent's heirs at law, subject to a use for the incompetent's life in the trustee, the minors, and the incompetent. The lease provided for renewal, with a stipulation that the lessor should pay the appraised value of any building on the property at the end of the renewed term. It was adverse to the interest of the trustee individually to renew the lease, and also to that of the minors; nor could the trustee compel them to effectively consent to the renewal, and a failure to renew left the property free from the incumbrance of the lease and more convenient for sale, and such minors, in case the lease was not renewed, could not be obliged to contribute to the payment of the building at the end of the term. *Held*, that the trustee was not guilty of misconduct in failing to renew the lease as against his ward, and was not subject to have his account surcharged for the ward's interest in the renewed lease by reason of the failure to renew it.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 64–67; Dec. Dig. § 42.*]

Appeal from Special Term, Westchester County.

Judicial settlement of the account of James M. Anderson, as committee of the estate of Eugene Anderson, an incompetent. From parts of a final order charging the accountant with the ward's interest in a lease, which the accountant failed as trustee to renew, he appeals. Reversed.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and STAPLETON, JJ.

Benjamin N. Cardozo, of New York City, for appellant.
Willard N. Baylis, of New York City, for respondent Josephine Mali Hicks Anderson.

THOMAS, J. In 1884 Anderson leased 1180 Broadway for the term of 20 years upon an annual rental of $2,000 and certain taxes, with an option to the lessee to renew for a similar term upon a rental of 5 per centum of the value of the lot and all taxes and assessments, with stipulation that the lessor should pay the appraised value of any building on the property at the end of the renewed term. The trustee under Anderson's will bought the lease in 1894 for $32,691.31, together with a mortgage thereon on which $20,000 was unpaid, and paid for it from certain income accumulated pursuant to testamentary directions. But when the lease expired, in July, 1904, James, then the trustee in place of his mother, who died in 1896, did not renew it, and in this proceeding for an accounting by James as committee since 1896 of his incompetent brother Eugene, who, married, but without issue, died in 1912, and who owned one-third of the lease, the committee has been surcharged with one-third the cost of it and interest thereon from July 31, 1903, to which time the incompetent was credited with his share of the returns of the property.

[1] By the terms of the will Eugene had no interest in the accumulations, or in the corpus, or practically in the income, and the purchase could not have been considered at the time as having been made for him or in his interest, but rather for the benefit of those who were entitled to the income of the properties and the remainders. But in 1903 the infant children of testator's daughter Lizzie, Benedict by name, who had died in 1899, brought suit against the trustee and others, · wherein it was decreed that the provision for the accumulations was void, and that the three children, James, Lizzie, and Eugene, took them in equal shares by the intestacy of their father in respect thereto, and so pursuant to the decree the trustee James turned over the accumulations including the lease, one-third to each child. That judgment and obedience to it forecloses all question as to the propriety of the purchase with the accumulations, and as to the title to it vesting in the parties named.

[2] But why is the committee surcharged as stated? Here it must be noticed that when the lease expired in 1904 one-third of the fee of 1180 Broadway vested in the Benedict children, one-third in James, while the other third was limited to Eugene's heirs at law, presumably James and such children, subject to a use during Eugene's life by him, the Benedict children, and James. Had the lease been renewed, James would for the term have owned one-third of the income, less his proper contribution to the rent and taxes, and at the end of the term he would have been entitled to receive one-third of the appraised value of any building on the lot. So that it is apparent that, if there were no renewal, not only would James lose his principal, but would share less in the income. But the Benedict children and James were the better for the lapse of the lease, in that (1) it left the property free from the incumbrance of a long lease, and so more convenient for sale; (2) they received all the income, less one-ninth; (3) they received all the purchase money on the sale; (4) they were not obliged to contribute to the payment of a building at the end of a new term. Indeed, it is conceded that it was a pecuniary advantage for them to be rid of the lease. But, even so, can James be charged for it? What default of duty as committee has he made?

It is urged that he should have deducted the cost of the lease to Eugene from the proceeds of sale of the property in 1905, when there was taken for the purchase price a mortgage on the property of $40,-000 by the Benedict children for their one-third, and one of $80,000 by James individually for his one-third, and, as trustee, for the other third that would go to Eugene's heirs. The respondent's theory is that, as the lease lapsed had enhanced the value of the property, Eugene should have made the owners pay for it when the property was sold. Assuming that the property rid of the lease was better sold, James could not legally compel the Benedict children to deduct something from money received by them; nor was James, as trustee or as an individual, owing himself as committee something merely for the enhanced value of the property. The lease was not in existence, and so no estate for years in which Eugene had a part was sold.

But it is urged that the lease should have been in existence, and was not by James' failure to renew it. If so, there may be reason to

make James respond, but not by compelling other interests to contribute. But the lease could not be renewed without the consent of the Benedict children and James individually and James as committee. It was against the interest of all owners of the fee to do it. James could not compel the Benedicts, infants, to do it. They could not by themselves make a lease that would survive their disaffirmance upon coming of age, and the court would not direct that their interest in the fee should be made subject to a term of years to their disadvantage. It was equally disadvantageous to James to renew the lease, and in my judgment he was not obliged to sacrifice his own pecuniary interests as a co-owner of the fee and of the lease to renew the same. Moreover, it is a serious question whether as committee he should have obligated Eugene and his estate to pay the new rental for a term of twenty years. But the court could have directed him as to that.

What, then, should have been done? The respondent should particularize. Should James have gone to the court and explained what I will assume was a conflict of interests, and asked that another committee be appointed? That would have been a prudent disposition of the matter. But, although the court could have appointed another committee, nothing could come of it, as the lease could not be renewed without the Benedict children and James joining in it as lessees, or consenting that it run only to Eugene as lessee—an impossible concession on their part, and one not demanded by law. What, then, has been the damage from James omitting to resign on application to the court, or sale of Eugene's interest in the lease upon its expiration? Who would buy? But, passing all such considerations, how is the sum surcharged the legal damage? I find no evidence that the cost of the lease to Eugene is the amount of his damage for failure to renew it on entirely different terms.

The respondent's counsel have corrected their impression that under the present lease the lessees were entitled to the appraised value of the building on the property at its expiration. But even that value was not shown. There was fault in this matter, and I consider that it was in adjudging that the lease was bought for Eugene, as that could not have been contemplated. I find no occasion to consider whether the matter has been adjudicated in previous accountings by the committee. But of what value is an accounting, if it effectuates nothing and sets nothing at rest?

The order, in so far as appealed from, should be reversed, and the report of the referee confirmed, with $10 costs and disbursements. All concur.